Filed 3/17/17

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re Matthew C., A Person Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY,<br><br>       Plaintiff and Respondent,<br><br>v.<br><br> STEPHANIE M.,<br><br>       Defendant and Appellant. | A147877 & A149683<br><br>(City & County of San Francisco Super. Ct. No. JD15-3323) |
| STEPHANIE M.,<br><br>       Petitioner,<br><br>v.<br><br>SUPERIOR COURT OF THE CITY AND COUNTY OF SAN FRANCISCO,<br><br>       Respondent;<br><br>SAN FRANCISCO HUMAN SERVICES AGENCY, et al.,<br><br>       Real Parties in Interest. | |

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I Background, D, and II Discussion, B, C, and D.

1

In these consolidated dependency actions, Stephanie M. (mother) contests the juvenile court's detention and dispositional orders temporarily denying her visitation with her young son—Matthew C. (born October 2015). Specifically, she argues that the juvenile court abused its discretion in suspending visitation between mother and son because there was no evidence that monitored visitation would have been contrary to the minor's safety. In addition, mother challenges by writ petition the juvenile court's October 2016 decision to terminate her reunification services with respect to Matthew and refer the boy for permanency planning pursuant to section 366.26 of the Welfare and Institutions Code.[1] In particular, mother disputes the evidentiary bases for the juvenile court's findings that she failed to participate regularly and make substantive progress in court-ordered treatment, that there was no substantial probability that Matthew could be returned to her care within statutory timeframes, and that reasonable services were provided to her. In the published portion of this opinion, we join the Third District in concluding that parental visitation may be denied during the reunification period if such visitation would be inconsistent with the physical or emotional well-being of the child. (See *In re T.M.* (2016) 4 Cal.App.5th 1214 (*T.M.*).) Using this standard, we affirm the juvenile court's challenged visitation orders. In the unpublished portions of this opinion, we consider and deny mother's writ petition.

## I. BACKGROUND

### A. *Initial Dependency Proceedings*

On October 23, 2015, the San Francisco Human Services Agency (Agency) filed a dependency petition pursuant to subdivisions (b) and (j) of section 300, alleging that Matthew C.—the minor who is the subject of these proceedings— had suffered, or was at substantial risk of suffering, serious physical harm or illness due to his parents' substance

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified. All rule references are to the California Rules of Court. On our own motion, we consolidated these matters for decision on January 6, 2017.

2

abuse and domestic violence.[2]  In addition, the petition alleged that mother had three older children, none of whom were in her care.  Specifically, mother's daughter was in a legal guardianship with the maternal grandmother; her oldest son had an open dependency case in Santa Clara County where he was residing in a residential program under a permanent plan of long-term foster care; and the youngest of the three, also a son, had been privately adopted.

In its detention report filed the same day as the petition, the Agency stated that the police—responding to a domestic disturbance call on October 20, 2015, at approximately 2:00 a.m.—found mother and father drunk.  According to mother, after a few hours of verbal attacks, father had slapped her three times across the face.  She had punched him on the cheek, leaving a mark.  All of this occurred within three feet of newborn Matthew and despite the fact that mother had an active restraining order against father.

When mother and father were interviewed by Agency social workers the morning after the domestic dispute, both parents still appeared to be under the influence.  Moreover, as the social workers approached the residence, father was seen outside with a 40-ounce beer, yelling " 'take the baby away from her.  She doesn't deserve it.' "  That same day, father was arrested for disorderly conduct and public intoxication.  Mother reported that father had had a drinking problem for as long as she had known him (approximately two years), but claimed that she had been sober for about a year.  Prior to that time, mother had convictions for misdemeanor public intoxication in November 2013 and July 2014.  In addition, mother had previously been diagnosed with bipolar disorder.

At the initial detention hearing on October 26, 2015, the juvenile court temporarily detained Matthew in foster care and continued the matter to the next day for further hearing.  On October 27, the court confirmed the previous detention orders, made visitation orders, and authorized the Agency to release Matthew to mother at a residential

---

[2] Per mother's report, Matthew C. (father) is the biological father of Matthew.  Father was declared to be Matthew's presumed father on October 26, 2015.  He is not involved in these appellate proceedings.

treatment program, with the understanding that she would not leave the program with the child.

In its combined jurisdictional and dispositional report dated November 12, 2015, the Agency recommended that Matthew be declared a juvenile court dependent and that he reside with mother in residential treatment under a family maintenance plan. The Agency also provided some additional background with respect to mother's drinking and mental health concerns. On the issue of mental health, mother reported that she was originally diagnosed with bipolar disorder when she was 15. Although she was prescribed medication, she did not take it as directed because she did not believe she needed it. Rather, she ascribed her out-of-control behaviors to teenage rebellion. After the petition in this matter was filed, mother entered the Jelani House residential treatment program on October 31, 2015, and discussed her mental health history with the staff psychiatrist there. According to mother, both she and the psychiatrist felt that a diagnosis of severe anxiety was more fitting, and thus mother was given a prescription to treat that condition.

With respect to her drinking, mother had gastric bypass surgery in 2008 and began drinking excessively in 2009 in the wake of her divorce. She had a history of homelessness since that time. Mother admitted that she was aware that she was not supposed to drink alcohol after a gastric bypass because the body absorbs it in an unhealthy manner. Nevertheless, mother continued to drink, stating that the only times she made conscious efforts to reduce or discontinue her consistent use were during her two most recent pregnancies. Mother admitted, however, that, while pregnant with Matthew, she had relapsed a "couple of times."

Moreover, mother acknowledged that spending time with father was a catalyst for her drinking. In the early stages of her pregnancy with Matthew, she reported going to a five-day detox program, to Safe Harbor for a month, and then to a three-month program in Santa Clara County, which helped her maintain her sobriety by offering her housing stability. Mother conceded that, during this time, father was in and out of jail, which

4

added to her ability to remain sober.  Nevertheless, mother reunited with father once he got out of jail, in hopes that they could be a family.

Mother also minimized the domestic violence occurring between the couple, despite the fact that, at the time of detention, there were four active restraining orders against father which named mother as the protected person.  Further, although father had been convicted in March and June 2015 for restraining order violations, mother claimed not to remember the details of the incidents and downplayed their significance.  Finally, father also had a history of domestic violence with other partners, with convictions in 2005 and 2012, as well as a conviction for willful cruelty to a child in 2008.

On the other hand, once Matthew was detained, mother took quick steps to enter a residential treatment program to address her substance abuse and separate herself from father.  Further, neither mother nor Matthew tested positive for any substances at the time of the minor's birth, mother had received consistent prenatal care for Matthew, and mother cared for the infant in the first days of his life.  In addition, mother expressed her desire to abide by the terms of the restraining order, and, if necessary, to prioritize her son above her relationship with father.  Finally, according to the social worker, mother acknowledged the seriousness of domestic violence in any relationship, and an "in-depth conversation" was had with mother "regarding the potential disastrous outcome of another domestic violence incident in the presence of her young child."  On this basis, the Agency recommended that Matthew be placed with mother under a family maintenance plan, on the condition that mother continued to reside in a residential treatment program.

At the combined jurisdictional and dispositional hearing on November 17, 2015, the juvenile court—after making certain alterations to the petition—determined the allegations in the amended petition to be true and found Matthew to be a child described by subdivisions (b) and (j) of section 300.  Thereafter, the court declared Matthew to be a juvenile court dependent and placed him with mother under a family maintenance plan.  This in-home placement was expressly contingent on mother remaining at, and in compliance with, her residential program.  Further, mother was ordered to engage in a service plan that, in addition to requiring completion of a residential drug treatment

program, included participation in a domestic violence support group, individual therapy addressing trauma and domestic violence, and treatment by a qualified mental health professional. "Supportive services" were recommended for father as the non-custodial parent. A six-month review was set for May 2016.

**B.** *The Supplemental Petition*

Unfortunately, less than a month later, on December 3, 2015, the Agency filed a supplemental petition seeking detention of Matthew after mother left residential treatment with the minor in late November and never returned. According to the detention report filed that same day, mother had remained sober for approximately two weeks—from October 31 to November 19—in residential treatment at Jelani House, before transferring to another treatment facility, Women's Hope. Matthew was returned to mother's custody on November 17 under her family maintenance plan and both mother and son moved to Women's Hope on November 20, 2015. Shortly thereafter, mother was authorized by staff to take Matthew on a day pass for Thanksgiving (November 26) and never returned with the minor. According to staff, other residents at mother's treatment facility reported that mother was in a hotel in San Francisco and was drinking and using drugs. Mother had also reportedly stated that she was "sick of her son" and was not feeding him.

Several days later, on November 29, 2015, six-week-old Matthew was found abandoned in a Starbucks at the Great Mall in Milpitas. He was left in a stroller which also contained a half full bottle of vodka, a few baby items, a journal, and a dependency drug court reminder with mother's name on it. Matthew's physical condition was "very poor." He was not properly dressed for the weather, his diaper was soiled, and his clothes were soaking wet. He was also extremely hungry, immediately drinking two bottles when they were offered. After he was transported for medical evaluation, hospital staff assessed that Matthew had a diaper rash, a lesion in a fold on his upper leg, scalding burns on both of his legs which were determined to be non-accidental, and an adult human bite mark on his lower left leg.

Apparently, mother and Matthew had reunited with father despite the active restraining orders precluding father from having contact with mother. At a different

6

location on November 29, mother and father were stopped by the police, as they were intoxicated in public and had been arguing. Once it was determined that they were the parents of the abandoned baby, mother and father were interviewed separately. Each gave different stories regarding Matthew's whereabouts. Mother, for instance, claimed that, after she and father had argued that morning, she left the baby with him. She stated that father later told her that he gave the baby to his sister or possibly to his ex-wife. Mother then met up with father again about 1:00 p.m. and they started drinking until the police intervened. In contrast, although the police had not told father where Mathew was found, father averred that mother had called him earlier that day, stating that she had abandoned the baby at a Starbucks. Father was eventually taken to jail for violating the restraining order against him.

Mother next appeared at Jelani House late on the evening of December 1, 2015. Because she was drunk and reported being badly beaten and bitten by father, staff allowed her to stay the night before she was taken to the hospital for detoxification. Reportedly, she brought a bottle of vodka with her to the hospital under her jacket. When the social worker spoke to her in the emergency ward on December 2, however, mother stated that she was going to go into a program and get her baby back.

At the detention hearing on December 4, 2015, mother was not present as she remained hospitalized. She had been in contact with her attorney, however, and agreed to submit to detention. The juvenile court detained Matthew. Thereafter, it refused to order visitation between mother and son, concluding that, at that point, it would be detrimental to the best interest of the child to have any contact with mother.

In its dispositional report on the supplemental petition, filed January 25, 2016, the Agency again related mother's history of drinking and mental health issues. The Agency also stressed that mother had been court-ordered to complete a substance abuse program on at least two occasions as a condition of probation, but had failed to do so. In addition, most recently, she had been involved in Jelani House, Women's Hope, and the Avenues for treatment, but did not complete any of those programs. Indeed, although mother went to the Avenues, a mental health program, after Matthew was detained for the second time

7

and could have stayed there for two weeks, she chose instead to leave in order to reunite with father upon his release from jail. Reportedly, mother told staff at the Avenues that she was going to return to father, despite the restraining orders, because she wanted to be a family with him. Moreover, while in the program, she showed "no openness nor willingness to engage in services." Mother had not been in touch with the social worker since she left the Avenues. The Agency opined that mother needed to be sober before she could begin to face her domestic violence and mental health issues.

In the meantime, when the minor came into shelter care after being rescued by the police, he was so hungry he drank three six-ounce bottles of formula in rapid succession. When his foster mother had to change the dressings on his burn and bite marks, he screamed in pain, leading the social worker to comment that the tiny infant had had a "tremendous amount of physical suffering to endure." Moreover, when Matthew came into foster care, he was irritable, fussy, and unhappy. However, since that time, he had gained weight, grown quickly, and become calm and happy.

Jurisdiction and disposition on the supplemental petition proceeded on January 26, 2016. Although noticed, neither parent was present. Mother's attorney asked for a continuance, reporting that she had received a message from mother, the day before, indicating that she was ill and could not attend. The court denied the request, noting that "it's time to proceed because the baby really needs an expeditious resolution to this matter." Indeed, the court saw no good cause for a continuance and expressly found that the nonappearance of both parents was willful. After certain amendments were made to the petition, the juvenile court found the amended allegations true. The court also made dispositional findings and orders, which included the provision of reunification services for both parents. The reunification plan ordered for mother included: completion of a residential dual diagnosis mental health and drug treatment program; obtaining and maintaining suitable housing; participation in both a psychiatric and a psychological evaluation; compliance with a mental health professional's recommendations for therapy and medication; and compliance with the restraining order. The court, however, refused to authorize visitation between mother and Matthew as part of the reunification plan,

reasoning that mother needed to show some type of progress on her many issues before it would be willing to change its detriment finding. A six-month review was set for July 2016.

## C.    *Mother's Section 388 Petition*

About three weeks later, on February 19, 2016, mother filed a petition pursuant to section 388, arguing that her situation had improved such that she should now be allowed supervised visitation with Matthew. Specifically, mother reported that she had been at healthRIGHT360, a dual diagnosis residential program, since February 3, 2016, and was compliant with the program. Prior to entering treatment, she had been in a related detoxification program from January 29 to February 3, 2016.[3] She was also in at least weekly contact with her case managers at the Homeless Prenatal Program (HPP) and cooperating with her Agency social worker. Moreover, mother asserted that she was attending weekly therapy through her treatment program and was compliant with her psychotropic medications. She also claimed to understand the negative impacts of domestic violence and stated her intention to abide by the restraining order put in place to protect her. Mother requested supervised visitation with Matthew a minimum of six hours per week. She argued that such visitation would be in the minor's best interests because it would help support a healthy bond and attachment and would help mother successfully reunify.

On March 17, 2016, the juvenile court granted mother's section 388 petition and ordered supervised visitation between mother and Matthew a minimum of three hours per week, pending the start of therapeutic visitation.[4] The court also confirmed the six-month

---

[3] Father later filed a declaration indicating that he had been arrested for a domestic violence incident involving mother on January 29. Thus, mother's desire to seek treatment appears to have again coincided with father's unavailability through incarceration.

[4] In her appeal, mother filed a request for judicial notice of the juvenile court's March 17 minute order granting her request for supervised visitation. By order dated August 3, 2016, we indicated that we would consider mother's unopposed request with the merits of the appeal. As we have since consolidated the appeal with mother's subsequent writ

9

review date in July 2016.  On March 25, 2016, mother filed a notice of appeal challenging the juveniles court's detention orders of December 4, 2015, and jurisdictional and dispositional orders of January 26, 2016, "including orders denying visitation for mother." (A149683).

**D.** *The Sixth-Month Review\**

Thereafter, the Agency filed its six-month review report on July 8, 2016.  The Agency reported that videotapes had revealed that it was father who had abandoned Matthew at the Starbucks.  Father first denied he lied to police, but later stated that he had to leave the baby there because he was "being chased by some guys."  Mother was now stating that she did not want to have any further involvement with father.  However, father was incarcerated for at least the next two years anyway, and there was an active restraining order prohibiting him from seeing mother or Matthew for the next three years.

Mother was reported to be residing at Women's Hope and, according to staff, was fully participating in the program.  Moreover, in addition to the staff therapist that she was seeing to address her substance abuse issues, mother was given an outside therapist in hopes that she could deal with her deeper psychological issues with someone with whom she could continue treatment after her graduation from the program.  However, despite mother's engagement in treatment, the Agency raised a number of concerns.

For instance, when mother had appeared at Jelani House in December 2015, she had been badly beaten by father, with a concussion, two black eyes, and bruises and bite marks all over her body.  Nevertheless, after her admission to the Avenues psychiatric program, staff felt her main focus was on father, not Matthew.  And, as soon as father was released from jail she abruptly left the program to be with him.  Further, mother had reported that, since her divorce in 2008, she had had two relationships characterized by severe domestic violence.  As she had not been involved with anyone after father, she

petition and the consolidated record includes the minute order at issue, we deny mother's request as moot.

\* Part D of this opinion is not certified for publication.  (See fn., *ante*, p. 1.)

could not demonstrate how she would better manage the conflicting needs present in a relationship.

In addition, when mother's ongoing social worker was finally able to meet with mother on February 29, 2016, mother stated that father had beaten and bitten her, but had not injured the baby. She was unable to explain what had happened to Matthew. Further, she had a flat affect and did not ask how Matthew was doing, where he was, or anything about him. Although mother was more expressive and responsive at a meeting on March 17, 2016, she still would not talk about Matthew's injuries and, indeed, asked the social worker why she kept mentioning them. At their most recent meeting in June 2016, mother told the social worker that she did not want to discuss what Matthew had been through because: " 'None of it was my fault other than using bad judgment.' " The social worker was concerned about mother's failure to take any responsibility for Matthew's injuries, noting that it was mother's sober decision to leave her program with the baby and meet up with father in defiance of a court order that put Matthew at risk.

Further, after six sessions with her community therapist, mother decided to discontinue therapy in June 2016, despite requests by the social worker and mother's other providers that she continue until a new therapist could be located for her because her reunification time was short. Mother initially told the social worker she would continue, but changed her mind three days later. According to the therapist, mother had been working hard on her issues, and she was confronting mother on those issues before therapy was stopped.

Mother had also reported a relapse on April 20, 2016. Although mother was taking medication that would make her violently sick if she drank alcohol, she had skipped the medication that day because she was scheduled for oral surgery. The social worker told mother that relapse is a normal part of recovery and that she should forgive herself and strive to stay clean. Nevertheless, the social worker believed that the incident made "clear that mother must make the choice to never have any alcohol again in order to begin to approach her own stable mental health." Indeed, although mother was in a supportive environment and had been removed from her abuser (through incarceration)

11

and from alcohol (through daily medication), she relapsed at the first opportunity, only three months before the scheduled review hearing.

Matthew was generally doing well in foster care. However, he continued to have night terrors, during which he screamed until he could be woken up, calmed, and put back to bed. In addition, in March 2016, Matthew sustained a spiral fracture to his arm after the foster parents reported that he had fallen out of his stroller. The doctor opined that spiral fractures are highly suspicious for non-accidental trauma. However, while non-accidental trauma could not be ruled out, the doctor agreed Matthew could have been injured from getting his arm stuck in the stroller straps while falling. Given concerns about the injury, Matthew was moved to a new foster home on March 24, 2016.

The therapeutic visit monitor reported that mother's visits with Matthew went well, in that mother was open to suggestion, engaged in play, was attuned to Matthew's needs, was affectionate, and seemed to have a good bond. When the social worker supervised visits, however, she noted that mother had to be prompted to ask about Matthew's well-being, and had to be instructed how to feed the baby and not to handle the baby too roughly. Further, mother did not demonstrate much empathy for Matthew. Although informed about her son's night terrors, for instance, she never thereafter asked for an update on this issue. According to Matthew's foster parents, his night terrors were more frequent following visits with mother.

In the end, the social worker stressed the "tremendous amount of work" done both by drug dependency court staff and by residential treatment staff to help mother with her many problems. Nevertheless, despite having been in seven treatment facilities in the minor's eight months of life and having been given "the benefit and commitment of a team of hardworking and good professionals who have tried hard to engage her," in the social worker's opinion, mother had "not begun to address the issues that brought Matthew into care." Rather, when the social worker asked mother about her progress in treatment, mother "present[ed] a list of things she [had] done, but not any specific new understandings of her life." In particular, mother had not "explained any new techniques to manage her relationships with other people, to manage her cravings for alcohol, her

12

desire to see [father, or] her feelings about being away from her son." Nor had she begun to develop any protective capacity towards Matthew. Thus, the social worker worried that mother was "simply going through the motions," and was not really willing or able to change the way she lived her life. Under such circumstances, the social worker concluded that mother's many issues were simply too complex to allow for the possibility of reunification if services were extended for another six months. She recommended that reunification services be terminated for both parents and that a hearing be set pursuant to section 366.26 so that a permanent plan could be developed for Matthew.

On the scheduled hearing date, July 28, 2016, the matter was continued to August 25, 2016, because mother was in the hospital after undergoing a medical procedure. In advance of the continued hearing, however, the Agency filed an addendum report changing its recommendation for mother. Specifically, the Agency requested that mother be provided six more months of reunification services. Apparently, a meeting of all of mother's providers was held on August 17 at which the providers spoke encouragingly about mother's treatment progress, including her attendance and enthusiasm at groups, her participation in domestic violence support, her participation in therapy and family treatment court, and her increasing ability to express herself. Based on this input, the Agency reconsidered its original recommendation to terminate mother's services.

Since its last report, the Agency had also received mother's psychological evaluation. According to the evaluation, mother met "criteria for Attention Deficit Disorder [(ADD)], predominantly inattentive presentation; Post Traumatic Stress Disorder; Major Depressive Disorder, Depressive, in partial remission; Alcohol Use Disorder, Severe, in early remission; and Other Specified Personality Disorder due to [mother's] presentation of mixed personality features of Borderline Personality Disorder, Dependent Personality Disorder, and Antisocial Personality Disorder." Recommendations included psychiatric consultation to treat mother's depression and ADD symptoms and individual psychotherapy, including cognitive behavioral therapy (CBT) and dialectical behavioral therapy (DBT) approaches, to treat her personality

13

disorder and trauma.  Domestic violence education was also recommended.  The Agency indicated that it would be requesting a new community therapist for mother that specialized in CBT and DBT modalities, if available.  It was also requesting a psychiatric assessment with recommendations for medication and treatment.

At the hearing on August 25, 2016, the six-month review was set for contest on September 28, 2016, as Matthew's attorney opposed the continuation of services for either parent.  In addition, father's attorney wanted to challenge the Agency's recommendation to terminate his services.   Prior to the contested hearing, however, the Agency filed a second addendum report, changing its recommendation back to termination of reunification services for mother.  Apparently, on September 6, 2016, mother chose to leave Women's Hope after she had tested positive for alcohol and had been found to be in possession of alcohol over the Labor Day weekend.  Specifically, after another resident suggested that mother might be drinking, mother tested positive for alcohol on September 5 and two bottles of alcohol were found in her room.  Mother admitted usage and was asked to avoid contact with other residents until her case was discussed.  When mother still appeared intoxicated the next day, she was again tested and found positive for alcohol, and another room search uncovered an additional bottle of alcohol.  At that point, staff told mother that she would be discharged for repeatedly bringing alcohol into the program, but stated that they would work with her to help her transition to another program.  However, later that day, staff observed mother leaving the program and walking to the liquor store on the corner.  When she attempted to come back to the program with a bottle under her shirt, mother was told she could not enter with the alcohol.  Mother then left.

Mother's HPP case manager spoke with mother on September 7.  Mother reported that she had gone to stay in a motel in Oakland with a male friend, but had ended up spending the night at the hospital after an individual came to the motel and assaulted her friend.  Mother's service providers were all working to find a new program for mother.  Mother called the social worker on September 8, 2016, explaining that she had left Women's Hope because her roommate was using drugs and the program was " 'all

14

bad.' " Mother admitted to drinking, stating she drinks when depressed, but maintained that she needed to leave the program because it was " 'not good.' " She revealed that she was currently residing in Palo Alto with a friend, but would give no further information. She admitted that she had continued to drink since leaving Women's Hope.

Mother did state that she would keep her September 8 appointment with her new therapist. She also claimed that she was willing to enter another substance abuse program. However, mother had missed a scheduled visit with her son on September 7. Further, when the social worker suggested Jelani House and Epiphany House as possible treatment options, mother stated she would not go to those programs because " 'they don't let me do anything.' " Although she understood that it was important for her to enter a program as soon as possible and that other programs might not be available, mother continued to state that she did not want to go to either program.

Citing mother's pattern of engaging in services but failing to complete them, the Agency could no longer recommend that mother's services be continued. The Agency noted that this was not a simple relapse. Rather, after relapsing and being confronted, mother continued to drink alcohol and seek alcohol. Moreover, upon leaving her program, mother immediately placed herself in a situation where there was violence. Based on mother's recent actions, the Agency concluded that, even though mother had been engaged in services and was progressing, she still had not "been able to build the appropriate skills and network to maintain her sobriety and make positive choices that will keep herself and her child safe." The Agency did not believe that mother would be able to demonstrate in the next six months that she could ameliorate the conditions that led to the removal of her son.

After another continuance due to the death of the maternal grandmother, the contested six-month review hearing was finally held on October 14, 2016. Mother failed to appear, although she had been in touch with her attorney the previous day. After the Agency submitted its three reports into evidence, counsel for mother submitted two letters on mother's behalf. The first was a letter from one of mother's HPP case managers, dated before her most recent relapse, which detailed mother's engagement in

15

her many services and recommended that reunification efforts continue. The second was a similar letter from a different HPP case manager. Although dated after mother left treatment, the letter did not discuss her relapse or its impact on mother's ability to reunify within statutory timeframes.

Mother's attorney argued that mother had been positively engaged in services, including visitation with Matthew, for a significant period of time and, although she had experienced some recent setbacks, she should be given additional time so that she could engage in the services recommended by her recent psychological evaluation. Counsel for the Agency, in contrast, asserted that there was no part of the record which indicated that there was, in fact, a substantial probability of return if services were extended. The juvenile court indicated that it had reviewed the entire, extensive file and agreed with the Agency. Specifically, the court stated that, while it appreciated that mother was making "valiant efforts," it was "very concerned" about her. Indeed, the court opined that mother was "in no position right now to even focus on the baby." Rather, the court agreed with the psychological evaluation that mother needed a full 12 months of residential treatment before there would be less risk of relapse, concluding "I don't think six more months is really going to be enough for mom." As a result, the court followed the Agency's recommendation, terminated mother's reunification services, and referred Matthew for permanency planning pursuant to section 366.26.[5]

Mother subsequently filed a timely notice of her intent to file a writ petition, and the petition itself was filed on November 18, 2016. (Rules 8.450(e), 8.452; A149683.)

## II. DISCUSSION

### A. *Denial of Visitation*

As mentioned above, mother challenges on appeal the juvenile court's orders at both detention and disposition on the supplemental petition which temporarily denied her visitation with Matthew. At each of the two hearings at issue, the juvenile court refused

---

[5] As the hearing was scheduled for February 9, 2017, we issued a stay of the proceedings on February 1, 2017, pending resolution of this matter.

to order visitation based on its conclusion that such contact would be detrimental to the minor. Mother argues that there was absolutely no evidence that monitored visitation would be inconsistent with the infant's well-being and that the absence of visitation negatively impacted her ability to forge a loving and close bond with the minor.[6]

As it turns out, the standards for denying visitation in this context are not as clear-cut as one might expect. With respect to disposition, subdivision (a)(1) of section 362.1 provides that any order placing a child in foster care and ordering reunification services must provide for visitation between parent and child, subject to two caveats. First, "[n]o visitation order shall jeopardize the safety of the child." (§ 362.1, subd. (a)(1)(B).) Second, "[v]isitation shall be as frequent as possible, consistent with the well-being of the child." (*Id.*, subd. (a)(1)(A).) According to the statute, these visitation requirements exist "[i]n order to maintain ties between the parent . . . and the child, and to provide information relevant to deciding if, and when, to return a child to the custody of his or her parent." (*Id.*, subd. (a).)

There is currently a split of authority as to whether section 362.1 mandates visitation absent evidence of a threat to the minor's *physical* safety (see, e.g., *In re C.C.* (2009) 172 Cal.App.4th 1481, 1491-1492 (*C.C.*)) or whether courts may also deny visitation based on potential harm to the minor's *emotional* well-being (see, e.g., *T.M., supra*, 4 Cal.App.5th at pp. 1219-1220).[7] The Second District in *C.C.*, for example,

---

[6] The Department urges us to dismiss mother's appeal as moot because the juvenile court reinstated mother's visitation approximately three months later, on March 17, 2016, in response to a petition under section 388. However, we will reach the merits of mother's claim because it is arguably relevant to the arguments made in her writ petition that additional services should have been provided to her.

[7] There also appears to be some disagreement as to the appropriate standard of review in these matters. Specifically, some courts have applied the substantial evidence test, others have reviewed for abuse of discretion, and still others have applied a blended standard, finding no abuse of discretion where substantial evidence supports the order. (See *T.M., supra*, 4 Cal.App.5th at pp. 1219-1221 [collecting cases and applying a blended standard].) Not long ago, we noted that it is unclear "whether the two standards are so different in this context." (*In re D.B.* (2013) 217 Cal.App.4th 1080, 1092, fn. 7.) And

17

reasoned that a "strict legislative limitation on suspending or denying all parental visitation during the reunification period is no accident: Without visitation of some sort, it is virtually impossible for a parent to achieve reunification." (*C.C.*, *supra*, 172 Cal.App.4th at p. 1491.) It thus construed the language of the statute to mean that "when reunification services have been ordered and are still being provided . . . some visitation is mandatory unless the court specifically finds any visitation with the parent would pose a threat to the child's *safety*. The frequency of such visits, in contrast, depends on a broader assessment by the court of the child's 'well-being.' " (*Ibid.,* fn. omitted.) Applying this standard to the facts of the case, the *C.C.* court concluded that the record did not support the existence of a threat to C.C.'s safety, where there was only an isolated reference that the minor might harm himself and there was no evidence that the minor's mother presented any threat to his physical safety during monitored visitation in a therapeutic setting. (*Id.* at p. 1492.)

More recently, in *T.M.*, *supra*, 4 Cal.App.5th 1214, the Third District rejected the approach espoused by *C.C.* (*T.M., supra,* 4 Cal.App.5th at p. 1219.) Instead, it reasoned that, "[i]n addition to requiring a court to deny visitation if the child's safety is at risk, the plain language of section 362.1, subdivision (a) only requires visitation as frequently as the well-being of the child allows. Accordingly, if visitation is not consistent with the well-being of the child, the juvenile court has the discretion to deny such contact. As courts have explained, 'well-being' includes the minor's emotional and physical health." (*Ibid.*) In *T.M.*, the child welfare agency recommended against visitation with a father who had subjected the minor to " 'extreme physical abuse,' " causing the minor to be very afraid of him. Applying the standard set forth above—essentially a detriment test— the *T.M.* court affirmed the juvenile court's order suspending visitation which provided: " '[V]isitation between the child and father is detrimental until said time as the progress has been made in individual counseling and the child's safety can be assured during the

indeed, we need not reach this issue, as we would come to the same conclusion under any of the articulated standards.

course of visitation in a therapeutic setting and with conjoint counseling.' " (*Id.* at pp. 1218-1221.)

There is much to recommend the approach taken by the court in *T.M.* For instance, as the *T.M.* court, itself, acknowledged, its "reading of the statute is consistent with dependency law's guiding principle of the well-being of the child: 'While visitation is a key element of reunification, the court must focus on the best interests of the children 'and on the elimination of conditions which led to the juvenile court's finding that the child has suffered, or is at risk of suffering, harm specified in section 300.' " (*T.M.*, *supra*, 4 Cal.App.5th at p. 1220.) Under the *C.C.* test, in contrast, the juvenile court lacks the power to suspend visits harmful to a child's emotional well-being and thus the court " 'would be required to sit idly by while a child suffered extreme emotional damage caused by ongoing visits.' " (*Ibid.*, quoting *In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1357.) It seems exceedingly unlikely that such emotionally traumatic visits would do anything to advance a parent's reunification prospects, and, indeed, they might very well derail them.

Moreover, a visitation ban could almost always be re-imagined as an order for infrequent or conditional visitation. Thus, a juvenile court could easily avoid the more stringent test imposed by *C.C.* (and set forth in subdivision (a)(1)(B) of section 362.1) in favor of the general detriment standard advanced by *T.M.* (and set forth in subdivision (a)(1)(A) of section 362.1) simply by reworking its visitation order. For example, the court in this case could have ordered supervised visitation once per week, to commence upon proof that mother had stabilized in treatment. Our review of this "frequency" order would then clearly have been for consistency with the well-being of the minor pursuant to subdivision (a)(1)(A) of section 362.1. It makes no sense to subject identical situations to different standards based on word choice. Rather, we believe that the prohibition on parent-child visitation where there is a safety concern is best understood as marking the outer boundary of the juvenile court's discretion in setting the terms for visitation during the reunification period, where a presumption in favor of frequent visitation exists. So long as the juvenile court does not jeopardize the minor's safety, it is free to craft a

19

visitation order consistent with the minor's well-being and the parents' presumed desire for frequent contact. We therefore join *T.M.* in concluding that a juvenile court may suspend or deny visitation pursuant to section 361.2, subdivision (a), if such visitation would be inconsistent with the physical or emotional well-being of the child.

In addition, we further conclude that the standards for denial of visitation at detention are similar to those we have just articulated for the suspension of visitation during the reunification period. With respect to detention hearings, subdivision (e) of section 319 provides that, if the juvenile court orders a minor detained, it shall also "order services to be provided as soon as possible to reunify the child and his or her family if appropriate." And, our rules of court indicate that, at a detention hearing, "[t]he court must consider the issue of visitation between the child and other persons, determine if contact pending the jurisdiction hearing would be beneficial or detrimental to the child, and make appropriate orders." (Rule 5.670(c)(1).) Thus, it appears that parental visitation can be denied at detention based on a basic detriment finding. Indeed, the juvenile court may have even more leeway in this context to protect a minor's well-being, as reunification services need only be ordered "if appropriate." (§ 319, subd. (e).) This makes some sense, as the situation at detention is often very fluid, all of the facts and circumstances are generally not known, and any out-of-home placement order is, by definition, temporary.

Turning to the specific facts relevant here, we note that, at the detention hearing on December 4, 2015, mother was not present as she remained hospitalized. Mother's attorney, however, requested visitation between mother and son. The Agency responded: "Your Honor, given the facts of this case, I am going to ask at this time that a finding be made that visitation be detrimental to this child." The court replied: "I would *certainly* enter that finding" (italics added). Although mother's attorney pressed the issue, arguing that there was no evidence that supervised visitation would create any issues, the court reiterated its finding, stating: "I think it would be detrimental to the best interest of the child to have any contact with mother at this particular point."

20

We have no difficulty upholding the juvenile court's order suspending visitation as of the detention hearing. At that point, mother was still hospitalized after having been badly beaten by father, and her condition was unknown. Moreover, it was unclear whether it was mother or father who had intentionally burned and bitten the minor, thereafter abandoning him at the Starbucks in "very poor" condition. If mother was responsible for these odious and life-threatening actions, she showed an utter disregard for the well-being of her six-week-old son and clearly represented a physical and emotional threat to him, at least until her current situation could be assessed. Moreover, even if father was responsible for all of the specific abuse, mother's conduct still showed a gross lack of concern for Matthew's safety and well-being. First, she made the sober decision to leave treatment with Matthew and reunite with father against court orders and despite the fact that she had previously been counseled "in-depth . . . regarding the potential disastrous outcome of another domestic violence incident in the presence of her young child." Second, she decided to resume drinking while caring for the minor, reportedly stating during this timeframe that she was sick of her son and was not feeding him. Subsequently, after learning her child had been found abandoned, mother nevertheless continued to drink, even attempting to bring a bottle of vodka with her to the hospital. In short, mother's behavior was completely out of control and represented a continued threat both to herself and to her young son, regardless of the setting. (Cf. *T.M.*, *supra*, 4 Cal.App.5th at p. 1218 [in suspending visitation, the juvenile court noted that the father was "unable 'to control himself in any setting' "].) Finally and importantly, Matthew was seriously injured, and thus it was reasonable for the court to conclude that the infant should not be subjected to any additional stress during his healing process. These circumstances more than amply support the juvenile court's conclusion as of the detention hearing that visitation would be detrimental to Matthew.

With respect to the court's dispositional visitation order, both jurisdiction and disposition on the supplemental petition proceeded on January 26, 2016. Although noticed, neither parent was present. At the hearing, there was some discussion that supervised visitation would now be appropriate since mother was being offered a

21

reunification plan. However, when the court asked for the Agency's position on visitation, the social worker opined: "I don't think she should have visitation until we take a look at her because—well, from conversations I've had, I'm afraid she might be the person who bit the baby as well as burn[ed] the baby." The social worker further stated: "I think I need to talk to her and determine who did the biting of the baby, because apparently she's bitten the father too and left a big bite mark on him. I don't want the baby to be injured. No matter how much the supervising . . . [¶] . . . [t]hey're not going to grab the kid out of her hands."

The juvenile court denied the request for visitation, reasoning that mother "needs to really be in a live-in residential treatment program." The court further elaborated: "She seems to think that domestic violence isn't the main issue, and it's one of the main issues, not that that—I mean, I think that she needs to understand the danger she puts herself in and the child in. And substance abuse is another extremely big issue, and obviously her mental health condition. *So until there is some progress*, however, we're going to define that, I am going to deny that request" (italics added). Although mother's attorney argued that, with appropriate supervision, the child could be ensured to be safe with mother, the juvenile court reiterated that mother needed "to show progress with herself first" and thus it would not "change the detriment findings *for today"* (italics added).

Again, we have little difficulty affirming the juvenile court's continued suspension of visitation based on the evidence presented. At the time of the dispositional hearing, mother was essentially on the lamb. After Matthew was abandoned and detained for the second time in December, mother was admitted to the Avenues, a mental health program, where she could have stayed for two weeks. Instead—even after everything that had happened—she chose to leave in order to reunite with father upon his release from jail. Moreover, while in the program, she showed "no openness nor willingness to engage in services." In addition, she had not been in touch with the social worker since she left the Avenues. Presumably, based on her history, she was actively drinking and jeopardizing her safety through continued association with father. And, although she was aware of the

22

dispositional hearing, she failed to appear and the court found this failure to be willful. Thus, there was absolutely no indication that mother had stabilized in any way. Further, the social worker was concerned that mother might have been the one who bit Matthew and felt she continued to be a safety risk, even in a supervised setting.

Finally, additional information regarding Matthew indicated that the minor was so hungry when he was rescued that he drank three six-ounce bottles of formula in rapid succession. He also screamed in pain when his foster mother had to change the dressings on his burns and bite marks, and thus, in the words of the social worker, had endured "a tremendous amount of physical suffering" as the result of his abuse and abandonment. Moreover, the infant was irritable, fussy, and unhappy when detained, but had since stabilized in foster care. Under the circumstances, it was undeniably reasonable for the court to require some progress from mother on her many issues before considering re-introducing her into the life of her obviously traumatized son. Thus, the evidence strongly supports the conclusion that the juvenile court's visitation order was crafted consistent with Matthew's physical and emotional well-being.

As the *T.M.* court noted, " 'the parents' interest in the care, custody and companionship of their children is not to be maintained at the child's expense.' " (*T.M.*, *supra*, 4 Cal.App.5th at p. 1220; see also *In re S.H.* (2003) 111 Cal.App.4th 310, 317 ["[i]t is the juvenile court's responsibility to ensure regular parent-child visitation occurs while at the same time providing for flexibility in response to the changing needs of the child and to dynamic family circumstances"].) However, the parents' interests are protected under the dependency framework as "there will be subsequent hearings, and therefore ample opportunity for the juvenile court to revisit the appropriateness of visitation in light of new circumstances." (*T.M.*, *supra*, 4 Cal.App.5th at p. 1220.) This is exactly what happened here, with the juvenile court reinstating mother's visitation approximately three months after it had been suspended upon a showing that she was progressing in residential treatment. We see no error.

**B.** *Participation and Progress in Service*[*]

In her writ petition, mother makes a number of arguments challenging the termination of her reunification services at the October 2016 six-month review. She first claims that the juvenile court's finding that she failed to participate regularly and make substantive progress in court ordered treatment is not supported by substantial evidence. (See *Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 763 [reviewing similar finding for substantial evidence] (*Angela S.*).) We disagree.

If a child is under the age of three on the date of his initial removal, subdivision (e) of section 366.21 provides that a juvenile court, at a six-month review hearing, may terminate reunification services and set a permanency planning hearing pursuant to section 366.26 if it finds "by clear and convincing evidence that the parent failed to participate regularly and make substantive progress in a court-ordered treatment plan." (§ 366.21, subd. (e)(3).) Mother argues here that—given her engagement in treatment for seven months during the reunification period and the positive reports regarding her progress submitted by her many service providers—the court's finding that she was not sufficiently engaged in treatment is unsupported by the evidence. To the contrary, mother asserts, "[t]he evidence in this case showed that [she] made great efforts to satisfy the Agency requirements, and that she substantially complied with her case plan services."

Arguably, the evidence mother sets forth in her briefing could constitute substantial evidence on appeal to uphold a lower court finding that she participated regularly and made substantive progress in treatment. However, this fact is irrelevant to our analysis where substantial evidence also supports the opposite determination. (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547, 545 (*Misako R.*) [" ' " '[w]hen two or more inferences can reasonably be deduced from the facts,' either deduction will be supported by substantial evidence, and 'a reviewing court is without power to substitute its deductions for those of the trial court' " ' "].) We conclude that is does.

---

[*] Section B of this opinion is not certified for publication. (See fn., *ante*, p. 1.)

With respect to regular participation in services, for instance, mother highlights her seven months in a residential program with all of its attendant services, but ignores the fact that she also experienced one relapse and two significant interruptions in treatment during her involvement with the Agency. While we acknowledge, as mother asserts, that relapse is a part of recovery, her April 2016 relapse was cause for concern because she had been in a supportive environment for months and had been taking medication that would make her violently sick if she drank alcohol, yet she relapsed at her first possible opportunity, on a day she skipped the medication due to oral surgery. In addition, mother had previously made the sober decision to leave treatment in November 2015—despite having been given the opportunity for the minor to be placed with her under a family maintenance plan—and this decision and mother's renewed drinking led to the significant abuse of both mother and child as discussed at length above. Mother then briefly entered another treatment facility, but failed to engage and soon left to reunite with father upon his release from jail. Indeed, mother did not seriously commit to re-entering treatment until January 2016—two months after she initially relapsed—and this was only after father was again arrested for domestic violence.

Most importantly, however, mother again began drinking and left treatment in September 2016, despite the fact that the Agency had recently reversed its decision and agreed to recommend additional reunification services for her. This was not a simple relapse. Rather, as the Agency put it "after relapsing and being confronted [mother] continued to drink alcohol and seek alcohol," and she immediately placed herself in a situation where there was violence. And, six weeks later—at the time of the October 2016 review hearing—mother remained out of treatment, despite several residential options being suggested to her. Under these circumstances, substantial evidence supports the juvenile court's conclusion that mother failed to participate regularly in court-ordered services.

Moreover, for many of the same reasons, the record also supports the juvenile court's conclusion that mother's progress in treatment was not substantive. The social worker's initial six-month review report recommending termination of services detailed

the Agency's many concerns with mother's progress, including mother's failure to take responsibility for her part in Matthew's injuries; the seriousness of her domestic violence history; mother's refusal to continue with her outside therapist; her April 2016 relapse; her failure to show empathy for Matthew or develop any protective capacity for the minor; and the social worker's opinion that mother was "simply going through the motions" without really making any substantive life changes. Although the Agency was nevertheless briefly convinced by mother's service providers to change its position and recommend continued services, mother's regrettable actions in September 2016 amply support the conclusion that the Agency had been right in its initial assessment of mother's situation. Indeed, despite all of the many services provided to mother and any headway she may have temporarily made coping with her many entrenched issues, mother was essentially—almost a year later—back where she had started at the commencement of the case. Thus, the Agency was "concerned that even though [mother] had been engaged in services and was progressing," her recent behavior showed that she "still [had] not been able to build the appropriate skills and network to maintain her sobriety and make positive choices that [would] keep herself and her child safe." Based on all of this substantial evidence, we see no error in the juvenile court's conclusion that mother failed to participate regularly and make substantive progress in court ordered treatment.

## C.    *Extension of Services*[*]

In a related vein, mother also argues that substantial evidence failed to support the juvenile court's finding that there was no substantial probability that Matthew could be returned to her care within six months if additional services were provided. Pursuant to subdivision (e)(3) of section 366.21—for children like Matthew who are under the age of three at the time of detention—the juvenile court must continue services to the 12-month permanency hearing if it finds that there is a substantial probability that the child "may be returned to his or her parent . . . within six months." Here, mother argues that she visited the minor consistently, once her visitation was reinstated, and that she had made

---

[*] Section C of this opinion is not certified for publication. (See fn., *ante*, p. 1.)

26

significant progress in treatment such that return within statutory timeframes was possible.

As a preliminary matter, we note that mother had only three months rather than six within which to demonstrate a substantial probability of return. The 12-month permanency hearing must be held within 12 months of the date the minor entered foster care as that term is defined by section 361.49. Pursuant to that section, a child enters foster care on the earlier of the date of the jurisdictional hearing or the date that is 60 days after the date the child was initially removed from the physical custody of his or her parent. Here, Matthew was detained on December 3, 2015, and jurisdiction on the supplemental petition took place on January 26, 2016.[8] Thus, the 12-month hearing was required to take place by January 26, 2016, only three months after the contested October 14, 2015 six-month review. (§ 361.49.) For purposes of discussing substantial probability of return, when the 12-month permanency hearing is less than six months away, a court considers "only what the impact of [that lesser time for additional services] would be on the parent and child." (See *Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 846.)

Unfortunately, in this case we agree with Agency counsel below that there was no part of the record which indicated that there was, in fact, a substantial probability of return if services were extended for three more months. As discussed above, mother had relapsed and had not been in treatment for six weeks as of the six-month review hearing. She had deeply engrained substance abuse and mental health problems, as well as a

---

[8] Contrary to the Agency's calculation, because disposition on Matthew's original petition did not result in removal—as Matthew was placed with mother under a family maintenance plan—the reunification clock did not start running based on this earlier intervention. (See *In re A.C.* (2008) 169 Cal.App.4th 636, 649 [reunification clock begins to run only when minor formally removed from parental custody at disposition; family maintenance services ordered at disposition do not trigger timelines].) Rather, it was detention on the supplemental petition in December 2015, and the related January 2016 jurisdictional and dispositional hearing which resulted in an order for out-of-home care, that are relevant for purposes of setting the 12-month permanency hearing in accordance with section 361.49.

history of entering but failing to complete treatment. And, there were legitimate bases for concluding that mother's progress on her many issues during the reunification period was not substantive, despite her seven months in treatment. In the opinion of the Agency, even six more months of services would not be enough to allow for the safe return of the minor. The juvenile court agreed, endorsing the psychological evaluation's conclusion that mother needed a full 12 months of residential treatment, and stating: "I don't think six more months is really going to be enough for mom." Under the circumstances, the juvenile court's determination that the continuation of services for mother was unlikely to result in the return of the minor during statutory timeframes was amply supported by the record.

**D.     *Reasonable Services*[*]**

As a final matter, mother argues that the juvenile court erred in terminating her reunification services because reasonable services were not provided to her by the Agency. (See, e.g., § 366.21, subd. (e)(3) [the court "shall continue" a case to a 12-month permanency hearing if the court finds at the six-month hearing that reasonable services have not been provided]; *id*., subds. (f) & (g)(1) [continuance of case from 12-month to 18-month hearing where reasonable services have not been provided].) Specifically, mother claims that her reunification services were unreasonable because the Agency failed to arrange sufficient visitation between her and the minor.  In addition, mother challenges the reasonableness of the services provided to her because she was never offered the specific services recommended in her July 2016 psychological evaluation.

The adequacy of a reunification plan and the reasonableness of the reunification efforts made by a child welfare agency must be judged according to the circumstances of each case. (*Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1164.)  Further, "[i]n almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect." (*Misako R.*, *supra*, 2

---

[*] Section D of this opinion is not certified for publication. (See fn., *ante*, p. 1.)

Cal.App.4th at p. 547; see also *Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969.) Thus, when considering the adequacy of reunification services, "[t]he standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*Misako R., supra*, 2 Cal.App.4th at p. 547; see also *Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1425-1426.)

In particular, to support a finding that reasonable services were offered or provided, "the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult (such as helping to provide transportation and offering more intensive rehabilitation services where others have failed)." (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.) We review a reasonable services finding for substantial evidence. (*Angela S., supra*, 36 Cal.App.4th at p. 762.) And, under the present facts, we easily conclude that substantial evidence supports the juvenile court's finding that the services offered or provided to mother were reasonable.

With respect to visitation, we have already determined that the juvenile court's temporary suspension of visitation in this case was not erroneous. Thus, mother's only potentially viable complaint is that her visitation was not increased during the reunification period, despite the recommendation of the therapeutic visitation supervisor that she receive more time. Mother's visitation, however, was not reinstated until March 17, 2016. The social worker filed her initial six-month review report a little over three months later, on July 8, 2016, recommending that mother's services be terminated. This recommendation was based on a number of concerns as set forth above. Although the Agency changed its recommendation at the end of August 2016, suggesting that additional services be provided, this new recommendation was contested by minor's counsel. Then, mother left her residential program and resumed drinking a mere two weeks later. Given mother's history, the red flags identified by the social worker in her

29

July 2016 report, her initial recommendation that services be terminated, and the relatively short timeframes involved, we see nothing unreasonable in the Agency's decision not to increase visitation during this period.

Mother's other contention—that her services were inadequate because she was not given the opportunity to engage in several specific interventions recommended by her July 2016 psychological evaluation—is equally unpersuasive. Specifically, mother claims that she should have received the recommended psychiatric evaluation as well as a therapist specializing in CBT and DBT modalities before her services were terminated. The record reveals, however, that the Agency had found a new therapist for mother and that her first appointment was scheduled for September 8, 2016, two days after she voluntarily left treatment. Moreover, the Agency was recommending that a psychiatric evaluation be ordered if mother's services were extended. Thus, mother's failure to receive the benefits of these additional services had more to do with her extended relapse than with any failure by the Agency to provide reasonable services. More fundamentally, however, mother's argument ignores the vast number of appropriate services, including therapeutic and psychiatric resources, which were provided and/or offered to her throughout her involvement with the Agency. As the social worker correctly noted, there was a "tremendous amount of work" done both by drug dependency court staff and by residential treatment staff in this case to help mother with her many problems. Unfortunately, despite "the benefit and commitment of a team of hardworking and good professionals who . . . tried hard to engage her," mother's substance abuse, mental health, and domestic violence issues simply proved to be too long-standing and deep-seated to allow for any meaningful recovery within the statutory timeframes.

### III. DISPOSITION

The juvenile court's detention and dispositional orders temporarily denying mother visitation with Matthew are affirmed. Mother's writ petition is denied on the merits. (See § 366.26, subd. (l)(1)(C), (4)(B).) The finality of this opinion shall be governed by rule 8.264(b). (See also rules 8.452(i), 8.470, 8.490(b)(2)(A).) The previously imposed stay issued by this court is hereby dissolved.

30

_____
REARDON, J.

We concur:


_____
RUVOLO, P. J.


_____
STREETER, J.

Trial Court:                   San Francisco City & County Superior Court


Trial Judges:                  Hon. Susan Breall
                               Hon. Robert M. Foley


Counsel for Appellant:         Nicole Williams
                               Mariko Nakanishi


Counsel for Respondents:       City Attorney
                               Dennis J. Hererra
                               Lead Attorney
                               Kimiko Burton
                               Gordon-Creed, Kelley Holl and Sugarman
                               Jeremy Sugarman
                               Ada Lau

*In re Matthew C.* A147877, A149683